### HELFENSTEIN et al. v. REED et al.

(Circuit Court of Appeals, Eighth Circuit. June 11, 1894.)

#### No. 384.

LACHES—CLAIM OF TITLE TO LAND.

Claimants of land under a sheriff's sale, with full knowledge of the origin and character of their claim, entered into an agreement for its prosecution with an attorney, on terms indicating that it was regarded as of doubtful validity. An effort made, accordingly, to establish their title, was unsuccessful, and the claim was apparently abandoned for 25 years. During that time the land was laid out into lots, which were bought in good faith by numerous persons, many of whom placed valuable improvements thereon, and taxes and assessments for more than that time were paid by them. *Held*, that a bill to establish the claim was barred, notwithstanding a general averment therein denying laches.

[1] Unreported.

Appeal from the Circuit Court of the United States for the District of Nebraska.

This was a suit by John P. Helfenstein and others against Abraham L. Reed and others to establish complainants' title to certain lands. The circuit court dismissed the bill for laches. Complainants appealed.

On the 15th day of September, 1857, Robert Shields entered at the United States land office at Omaha, Neb., the W. ½ of the S. W. ¼ of section 10, and the N. ½ of the N. W. ¼ of section 15, town 15 N., range 13 E. of the sixth principal meridian, situated in Douglas county. On the 24th day of November, 1857, Helfenstein, Gore & Co., wholesale grocery merchants doing business at St. Louis, Mo., brought suit by attachment against Shields for $1,200 in the district court of Douglas county, and caused the undivided half of the lands entered by Shields to be attached. Helfenstein, Gore & Co. recovered judgment in the attachment suit against Shields for $1,204.80 and costs at the March term, 1858, upon which a special execution was issued on the 25th of June, 1858, commanding the sheriff to sell the lands which had been attached in the action; and in compliance with the command of the writ the sheriff offered the lands for sale on the 28th day of July, 1858, and Helfenstein, Gore & Co. became the purchasers thereof for the sum of $65; and on the 19th day of October, 1863, the sheriff, pursuant to an order of the court, executed a deed to the purchasers for the lands, which was filed for record the same day, and duly recorded in the recorder's office of Douglas county. The complainants are the heirs and grantees of the members of the firm of Helfenstein, Gore & Co., and entitled to whatever rights that firm acquired to the lands under their purchase at the sale thereof on the special execution against Shields. These lands, at the date of their entry by Shields, were within the corporate limits of the city of Omaha, and upon that, and probably other, grounds the validity of Shields' entry was contested for some time with varying results; but, in the view we take of this case, it is not necessary to go into a history of that litigation, or determine what rights, if any, Shields acquired under his entry. The lands were laid out into lots and blocks by persons claiming adversely to Shields, and became a part of the city of Omaha. Thomas J. Slaughter, a member of the firm of Helfenstein, Gore & Co., sued out the attachment against Shields, and had charge of this business, and conducted most of the correspondence relating thereto. The following letters relating to this land were written at their respective dates to Helfenstein, Gore & Co. by Mr. Poppleton, their attorney:

"Omaha, September 10, 1863.

"Thos. J. Slaughter—Dear Sir: You recollect the attachment levied on an undivided half of the property occupied by Shields in the fall of 1856, in favor of H., G. & Co.; that judgment was obtained thereon in March, 1858, and the property sold in July following, at a nominal price, the pre-emption of Shields having in the meantime been set aside as fraudulent and void. The sale took place after my sickness began, and all the subsequent actions in regard to it were managed by others, until in 1860, when Smith's Bro. made his entry of the land, and I sought to enforce his contract, without success. Well, in the course of time this matter takes a new complexion, and a few months ago Smith's entry was canceled by the general land office, and Shields' entry restored, and finally a patent issued to Shields. This coming to my knowledge, though the matter had really passed out of my hands, I have taken occasion to look into the condition of the proceedings had by Lake after the commencement of my sickness. I find some of the files in the case mislaid or lost, and the whole thing in confusion. The sale appears to have taken place regularly, but beyond that it seems not to have been carefully looked after. No deed has ever been made to H., G. & Co., and no steps taken to perfect their title. The reason I suppose to be that Lake, supposing the title worthless, as it was then, supposed it was unnecessary to incur the trouble and expense of perfecting his proceedings. There is still a way open possibly to make good your title, but it involves a long litigation and a large expense. Do you wish me to take any action in regard to it? If so, upon what terms? I will take

.hold of it for a regular fee in cash, or for one-half the interest if I succeed and nothing if I fail, or, in case of success, I will pay your debt and take the land. The title is still in controversy in court between Shields & Smith (is the brother), and may in the end go against Shields. So you see there is still risk. Write me fully at once.

"Yours, &c.,                                          A. J. Poppleton."

"Omaha, September 21, 1863.

"Messrs. Helfenstein, Gore & Co.—Gentlemen: Yours of the 15th inst. is at hand. There is too much uncertainty about the result of the controversy to justify me in paying any considerable sum for your claims against Shields, and taking all the risk. While I am willing to risk my services, I cannot add much to them to throw into the scale. If you will give me in your reply the very lowest amount in cash you will take for the claim, it is possible I may accept it; but I fear I cannot give what you would feel justified in taking. Please, therefore, give your lowest figure (and they must be very low if accepted), and at the same time state what course you desire me to take (if any) in case I do not come to your figures. I addressed Mr. S. in my last, and address this letter to him now because of his personal knowledge of this matter.

"Yours, respectfully,                                A. J. Poppleton."

"Omaha, October 3d, 1863.

"Thos. J. Slaughter, Esq.—Dear Sir: Yours of September 28th is at hand. As I anticipated, there is no prospect of our coming together on a purchase of the Shields claim. While the land is sufficiently valuable to make it a good operation in case of success at the price you fix, there is altogether too much risk to justify the venture. Whatever steps you take in the matter should be taken soon, as our next district court sits November 9th. I shall be absent from town about two weeks, but any letters addressed to me will be attended to on my return.

"Yours, respectfully,                                A. J. Poppleton."

"Omaha, October 20th, 1863.

"Messrs. Helfenstein, Gore & Co.—Gentlemen: Yours of October 10th is at hand, accepting one of my original propositions, viz. to prosecute your claim at my own cost and expense, and, in case of success in establishing your title, I to have the land and to pay your debt, principal and interest, you to be liable to no costs, fees, charges, expenses in any event, and I to incur no liability to you in case of failure, risking only my services, costs, and expenses. I believe we are agreed upon these terms, and, so understanding it, I accept them, and open the compaign at once.

"Respectfully yours,                                 A. J. Poppleton."

Mr. Poppleton testifies as follows: "Q. State whether you ever advised the firm of Helfenstein, Gore & Company of the fact that you had secured some lien or interest in the Shields land, and was endeavoring to make their claim out of it, and whether they knew of that fact. A. I did advise them, I think the latter part of 1863, and they did know of it at that time; that is to say, I advised them of the fact that the Shields title had been re-established. And I want to say right here that at the time the attachment was levied Shields' title was regarded as good. At the time of the sale, his title was regarded as bad. Afterwards—just when I can't say—a ruling was made by the proper land officer, either by the land commissioner or secretary of the interior, which re-established Shields' title. After that, though this particular business was out of my hands as attorney, I advised Helfenstein, Gore & Company of the situation, and of my belief that there was still a chance for them to make their money. Q. State whether, after you so advised the firm of Helfenstein, Gore & Company, any arrangement was made between that firm and you, by which you were to prosecute their claim, and make it out of the Shields land, if you could. A. I made an arrangement which was in substance this: I was to take my own course in proceeding to enforce the judgment, and to establish the interest of Helfenstein, Gore & Company in the land, and was to be paid nothing by them if I failed. If I succeeded, I was to have their interest in the land acquired under the sale upon paying them

the amount of the judgment and interest. That is my best recollection of the matter. I think this was the latter part of 1863. Q. State whether or not, in pursuance of this arrangement, you filed the cross bill, and took proceedings to collect the claim? A. My recollection is that the appearance in the Root Case was a part of the proceedings that I thought necessary to protect their interests."

Mr. Poppleton appeared for Helfenstein, Gore & Co., and filed an answer and cross bill in their name in a suit then pending involving the title to the land. Writing to Mr. Slaughter under date of July 26, 1869, he says: "If you understand the history of the present litigation, you know that when it was opened it was upon a title adverse to the one under which you claim. I came in, representing your title under the attachment, and set up your rights, and in the belief that I could sustain them; but upon careful investigation, as I progressed in the case, I became satisfied that I could not, and ceased to defend on those grounds. The reason I could not sustain your rights was because the sale and proceedings subsequent to judgment (which were conducted by other parties) were so irregular as to prevent me from establishing a title. As it turned out, however, it would have made no difference, for when the case came on for hearing the Root title was sustained, and the Shields title held void. From this judgment an appeal was taken to the Sup. Ct. of the U. S., and pending this appeal this settlement is made. The terms of the settlement I do not fully understand, as I was not a party to them. In the situation the matter now is, I have no hope of realizing your claim except by a proceeding against Smith, which I shall try."

The defendants deny that they are cotenants of the plaintiff, and, among other defenses, plead the statute of limitations and laches. The lower court dismissed the bill on the ground of laches, and the complainants appealed.

Upton M. Young and George W. Covell, for appellants.

William D. Becket, R. S. Hall, and J. H. McCulloch, filed briefs for appellees.

Before CALDWELL and SANBORN, Circuit Judges, and THAYER, District Judge.

CALDWELL, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

If the complainants and those under whom they claim ever had any right or title to the land in controversy, it was acquired by the purchase thereof at the sheriff's sale on the 28th of July, 1858. The sheriff's deed to the land was executed and recorded in 1863, and in that year the agreement was entered into between Helfenstein, Gore & Co. and Mr. Poppleton to the effect that he was to prosecute their claim to the land, and, if he was successful, he was to have the land and pay their debt, and, if unsuccessful, he was to pay all costs and expenses and receive no fees. Acting under this agreement, Mr. Poppleton made an unsuccessful effort to establish the Helfenstein, Gore & Co. title to the land by filing an answer and a cross bill in a suit instituted by Aaron Root against Shields, Helfenstein, Gore & Co. and others to establish and quiet his title to the land. In 1867 the circuit court of the United States sustained Root's title to the land, holding the Shields title void. Root v. Shields, Woolw. 340, Fed. Cas. No. 12,038. From this decree an appeal was taken to the supreme court of the United States, which was afterwards dismissed. It is claimed that Helfenstein, Gore & Co. were not concluded by the decree in that case. Assuming, but not deciding, that this contention is well founded, it cannot affect the result in this case.

The complainants' claim to the land had its inception in 1858. From that time down to the commencement of this suit, in 1892, Helfenstein, Gore & Co., or their representatives, resided in St. Louis, and their attorney resided in Omaha. During all this time the complainants and their grantors and their attorney knew all about the origin and character of the claim now set up to this land. That it was then regarded by them as of doubtful validity is shown by the arrangement entered into between Helfenstein, Gore & Co. and Mr. Poppleton for its prosecution. The effort then made to establish this title was unsuccessful, and the claim abandoned by Mr. Poppleton, who was perfectly familiar with all the facts, and who was the party to be chiefly benefited by establishing the title. For a quarter of a century the claim now set up by the complainants for this land was permitted to slumber, and appeared to have been abandoned by them and their attorney. Years ago the land was laid out into lots and blocks which have been bought and sold in good faith, and with no suspicion of the claim now set up by the complainants. Numerous persons have become the owners thereof, many of whom have placed valuable improvements on their holdings. The present owners and grantors have paid the public taxes and assessments on these lots for 35 years or more. The complainants and their attorney could not have been ignorant of these facts. The general averment is made in the bill that the complainants and those under whom they claim have "not been guilty of any laches in asserting their rights," but this is merely the statement of a legal conclusion, and goes for nothing in the face of the indisputable facts in the case. If the complainants and those under whom they claim ever had any rights in this land, they are barred by their laches from asserting them now against the present owners of the property. It is unnecessary to repeat here the conditions upon which courts of equity will impute laches. The rules applicable to this class of cases have been recently stated and applied by this court in several cases. Naddo v. Bardon, 4 U. S. App, 642, 2 C. C. A. 335, 51 Fed. 493; Railroad Co. v. Sage, 4 U. S. App. 160, 1 C. C. A. 256, 49 Fed. 315; Lemoine v. Dunklin Co., 10 U. S. App. 227, 2 C. C. A. 343, 51 Fed. 487.

The facts of this case bring it clearly within the rules laid down in the cases cited, and upon the authority of those cases, and the citations therein contained, and without repeating what is there said, the decree of the circuit court dismissing the bill for want of equity is affirmed.