**FIRST NAT. BANK IN LOWELL v. LOW-
ELL NAT. BANK et al.**

**No. 8312.**

Circuit Court of Appeals, Seventh Circuit.

Nov. 30, 1943.

Rehearing Denied Jan. 26, 1944.

Glenn D. Peters, of Hammond, Ind. (Bomberger, Peters & Northland, of Hammond, Ind., of counsel), for appellant.

Fred C. Crumpacker; John M. Stinson, and Schuyler C. Dwyer, all of Hammond, Ind., John W. Lyddick, of Gary, Ind., and Owen W. Crumpacker, of Hammond, Ind., for appellees.

Before EVANS and KERNER, Circuit Judges, and LINDLEY, District Judge.

In this action plaintiff sought an accounting of defendant bank's transactions in the liquidation of plaintiff bank, which was undertaken pursuant to an agreement of the two banks, executed March 15, 1930. Plaintiff bank was, at the time, in financial distress, and it turned over its assets to the defendant to liquidate. Defendant assumed plaintiff's obligations to depositors and certain other creditors and proceeded to liquidate its assets. In acounting to plaintiff, it charged interest at the rate of six per cent. on balances allegedly due it, and this charge is the most important item in controversy in this suit.

There is also involved a charge back of a sum arising out of a loss on two $4,500 notes and mortgage which were turned over to the defendant and which plaintiff alleges (but defendant denies) defendant accepted as cash and later improperly charged back or attempted so to do. The court found for the plaintiff.

One Heitman, joined as a defendant, was appointed receiver of the bank by the Comptroller of the Currency. Although he took the position that the interest was properly charged, and allowed the same after his appointment as receiver, he did not appeal from the judgment entered in this case. The decree provided that the amount which defendant should pay on the accounting should be paid to the receiver.

EVANS, Circuit Judge.

Plaintiff's bank closed in March, 1930 and went into voluntary liquidation. On March 15, 1930, plaintiff executed a contract with defendant concerning the liquidation of the bank's assets and their application to its liabilities. Pertinent provisions

of this contract are set forth in the margin.* There was no express provision relating to interest charges appearing in this agreement.

* "Contract.

This Agreement, made * * * this 15th day of March, 1930, * * * between The First National Bank in Lowell, Indiana, party of the first part, and The Lowell National Bank of Lowell, Indiana, * * * party of the second part,

Witnesseth: * * * whereas, in the opinion of the Board of Directors, of first party, it is not only undesirable but would be unprofitable for said bank to further continue its operations as a going concern, and it is further for the best interests of said first party and all those interested therein as stockholders or otherwise that said bank should go into liquidation and have its affairs wound up in the manner provided by law. and

Whereas, an emergency exists making it necessary for the Board of Directors of first party to take steps to protect its creditors and especially its depositors, * * *

Now, Therefore, the party of the first part, in consideration * * * does hereby sell, * * * transfer * * * to second party the following assets as shown by its books at close of business on March 15th, 1930, and such other assets as are represented by the following schedules, * * * :

Each of said schedules is * * * made a part of this contract, and it is agreed that the liabilities so scheduled represent all the liabilities to be assumed by second party, * * * except that the second party will pay for first party and charge to its account under the terms of this contract the following items: 14 to 21 both inclusive as shown on the schedule hereto attached, and such other items as are herein specified and any remainder after the assumption liability has been paid or selected.

* * * * * * *

1. All previous tentative offers and acceptances and tentative contracts and resolutions drawn by the respective parties preceding * * * the execution of this contract * * * are hereby * * * made a part of this contract, but it is * * * agreed that in case any of * * * such * * * tentative agreements are inconsistent with * * * this contract, the provisions of this contract shall control * * *.

2. * * * first party does hereby sell, assign, * * * unto second party, * * * all of its assets, * * *.

* * * * * * *

1. It is further agreed * * * that the property enumerated in Schedules 4, 5, 10, and 12 of this contract shall * * * become the absolute property of

| | | |
|---|---|---|
| Schedule 1. | Loans and Discounts, Group one | $256,822.83 |
| Schedule 2. | Premium on United States Bonds | 400.00 |
| Schedule 3. | Overdrafts | 23.27 |
| Schedule 4. | United States Bonds | 50,000.00 |
| Schedule 5. | Other bonds, Securities, etc. | 33,600.00 |
| Schedule 6. | Federal Reserve Bank Stock | 2,700.00 |
| Schedule 7. | Banking House | 9,000.00 |
| Schedule 7A. | Other Real Estate | 29,831.61 |
| Schedule 8. | Furniture and Fixtures | 3,400.00 |
| Schedule 9. | Due from Federal Reserve Bk., Chicago | 15,428.70 |
| Schedule 10. | Due from other banks | 9,233.77 |
| Schedule 11. | Due from U. S. Treasurer (5% funds) | 2,500.00 |
| Schedule 12. | Cash on Hand | 6,488.58 |
| Schedule 13. | Sundry cash items | 97.88 |

Party of the second part does hereby purchase the assets above enumerated, and pays for the same by the assumption of liabilities of first party, but none other, as herein enumerated:

the second party, and all other property herein enumerated shall be held as herein provided by second party as a fund out of which second party shall be repaid * * * for the obligations

| | | |
|---|---|---|
| Schedule 14. | Due to Trust Companies, Banks & Bankers | None |
| Schedule 15. | Cashier's Checks Outstanding | 1,480.45 |
| Schedule 16. | Deposits subject to check | 148,432.18 |
| Schedule 17. | Certificates of Deposit | 51,473.52 |
| Schedule 18. | Circulation outstanding | 49,994.00 |
| Schedule 19. | Re-discounts Federal Reserve | 7,375.00 |
| Schedule 20. | Savings Accounts | 64,311.36 |
| Schedule 21. | Bills payable | 15,000.00 |

Following the execution of this agreement, defendant entered upon its duties and continued to perform them for the two years specified in the agreement. On March 20, 1932, there was an extension of the agreement for one year. In this extension agreement there was a statement of the amount due on the liability account, of $62,172.61. This included charges of interest to date. This extension agreement, signed by the parties, contained this paragraph—

"* * * Whereas, said party of the first part is still liable on account of said transaction to said party of the second part, in the sum of Sixty-two Thousand one hundred seventy-nine and 61/100 ($62,-179.61) Dollars, and said party of the second part holds, in its possession, assets pledged by said party of the first part as collateral security thereto, in the sum of One Hundred Seven Thousand Five Hundred Seventy-six and 89/100 ($107,576.89) Dollars, exclusive of shareholders liability, and * * *"

Throughout the course of the liquidation defendant rendered statements. Each statement showed an interest charge. Interest was at first computed on a monthly basis, and later, on an annual basis.

hereby assumed * * *. The gross sum of liabilities under the terms of this contract assumed and to be paid by the second party, as shown by Schedules 14-21 inclusive, amount to $338,067.51. The first party shall be allowed a credit on said sum of all property enumerated in the said Schedules 4, 5, 10 and 12, and the difference remaining after deducting the total amount contained in these schedules shall represent a sum for which first party shall receive credit as the other property * * * assigned to second party are collected, * * *. The sum remaining after the deduction above set forth is made shall represent the obligation of first party to second party to be * * * paid as herein provided, and * * * shall be referred to * * * as the Liability Account due second party from first party. * * *

* * * * * * *

2. Second party shall * * * have the right to select any of the notes, overdrafts, or other securities, hereby * * * transferred to it at the then value * * * thereof * * * at the time of their selection, and to become the absolute and unconditional owner thereof, and, in the event of such selection, the then value * * * thereof shall at the date of such selection be applied as a credit on said Liability Account. * * *

* * * * * * *

1. * * * present officers and directors of first part, shall be its representatives, and shall have * * * duty of conferring with second party in reference to the handling of all of the assets and property assigned * * * to it, and the affairs generally of the first party. The second party shall, until all sums which it may be entitled to receive from said notes, overdrafts, and other securities have been fully paid, proceed with reasonable diligence, subject to the right of renewal and extension herein provided and reasonable business judgment, to realize upon and collect all of said * * * obligations without cost or expense to first party except out-of-pocket expenses by it incurred in realizing thereon, which expenses may be added to and included in the sum to be paid by first party herein termed the Liability Account. Nothing herein shall be construed as creating any liability against second party for any claims against first party which are not specifically enumerated herein, or for any liability in favor of stockholders arising out of their claims as such in said corporation.

* * * * * * *

1. If, on the 15th day af March, 1932, second party shall not have received enough from the property, hereby assigned to it, to equal the amount of or fully discharge said Liability Account, then * * * second party shall on said date be required to select from said notes, overdrafts, and other securities, an amount at the then worth or value thereof sufficient to discharge said Liability Account, and, after said selection or if said Liability Account has been fully discharged in any way prior to said selection, then any and all assets remaining in the hands * * * of second party * * * not necessary to discharge said Liability Account * * * shall be surrendered to first party or its Liquidating Agent * * *.

If on March 15th, 1932, the selection and acceptance of securities cannot be made by second party, or by both parties by mutual consent, first party shall have the right to take said securities and assets remaining in the hands of second party by paying to second party the full value or worth as herein defined of said assets and securities in cash or acceptable notes or securities and shall be entitled to credit on the Liability Account for such amount or amounts.

* * * * * * *

* * * (signed by the parties.)

In all it charged and collected $21,541.10 interest. This sum was allowed it upon a claim which it presented to the receiver of the plaintiff bank. It was also approved by the Comptroller of Currency. This sum represented the interest for the entire period of defendant's stewardship of plaintiff's assets.

In February, 1934, the Comptroller of the Currency appointed a receiver for the plaintiff bank and thereafter a claim of $34,786.66 was presented by defendant, and allowed by him.

In all there were assets of the approximate value of $350,000 turned over to the defendant and the liabilities of the bank were about the same.

The liquidation of plaintiff was completed in October, 1938, except for the items here in dispute.

One of these items arose out of a loss on two notes and a mortgage, known as the Foster loan. This was a second mortgage and on March 15, 1930, there was accrued interest in the sum of $122.83 unpaid. On that date, defendant credited plaintiff with the principal and interest of said notes on its liability account, in other words it took them over as cash. On May 3, 1930, the notes secured by this mortgage were renewed by defendant bank, and thereafter $1,000 was paid in reduction of the principal. On September 17, 1931, the unpaid balance of said notes was charged back to the plaintiff in the liability account with the consent of the then liquidating agent of the plaintiff bank, and with the knowledge of its directors. On November 3, 1937, the receiver compromised the balance due on said notes with the maker thereof for the sum of $1750, which was paid to defendant bank and then credited to plaintiff's liability account. These notes showed a net loss of $2,750 on the principal, excluding interest.

Defendant raises both procedural and substantive questions. They are:

(1) May the plaintiff enforce this alleged cause of action without prior demand on its receiver to bring suit and refusal of receiver to sue, or proof that such demand would be futile?

(2) Did the written contract expressly or impliedly provide for interest?

(3) Did the parties construe the contract to provide for interest, and if not, was the plaintiff estopped by laches or acquiescence to dispute interest payment?

(4) Is the cause of action barred by the Statute of Limitations or laches?

(5) Is the allowance of the claim by the receiver and approval of such allowance by the Comptroller, assailable (except for fraud) in this collateral action?

(6) Is the Indiana statute providing for interest upon written contracts, applicable here?

■ Going directly to the merits of the controversy, we are persuaded that defendant is, under the facts shown, entitled to retain the interest which it charged. Plaintiff long acquiesced in these charges. For that reason it should not be permitted to repudiate its action.

Regardless of whether plaintiff originally agreed to pay interest, it is undisputed that from the first, defendant included interest in its monthly balance statements and plaintiff did not object thereto.

More than this,—at the end of two years and when defendant could have terminated the contract, plaintiff entered into a new agreement wherein it expressly recognized the interest charges which had been made.

The finding of the court is in accord with the evidence and shows this item of interest was the subject of discussion by the stockholders of plaintiff, some of whom protested, but after such discussion and protest, the renewal agreement was signed. In fact, defendant was not informed that some of plaintiff's stockholders verbally protested at the meeting, whereat the extension, with interest included in the amount due, was considered and approved.

The action of the parties was in the nature of a contemporaneous expression of their understanding of the agreement at the time it was made. From the date of the second agreement, surely, there was at least an implied agreement by plaintiff that defendant was to receive interest on the liability balance.

Moreover, in addition to acquiescence, there are here present, facts upon which an estoppel against plaintiff is unavoidable. Mattison-Greenlee Service Corp. v. Culhane, 7 Cir., 103 F.2d 608.

■ Had plaintiff disallowed the interest charge when the extension agreement was negotiated, had it not agreed that the amount of the balance would include past interest charges, defendant could have then and there terminated the agreement and

demanded the amount due it. A sacrifice sale of securities might have resulted. Later disallowance of interest would be prejudicial to defendant for it would deny to it a right it had when the extension agreement was negotiated and when the propriety of the interest charge was recognized.

In other words, defendant agreed to an extension of the agreement, the obligations of which it could have immediately enforced. It took a position which it would not have taken but for the plaintiff's acceptance of its statement showing a balance which included interest charges.

It should also be added that the lapse of time in this case strongly supports an estoppel. Some of the officers of the bank, who were the principal negotiators of the original agreement, have died. Defendant had a right of action against stockholders of plaintiff to enforce the payment of its liability account. Some of the books of account can not now be found.

■ While there is a vital difference between laches and estoppel, it would seem defendant has been successful in establishing both defenses, laches and estoppel. Seven years of silence and of acquiescence during which death has taken its toll of the important witnesses and parties to the negotiations and during which time records have been lost, present persuasive facts which are material on both issues. Mattison-Greenlee Service Corp. v. Culhane, 7 Cir., 103 F.2d 608; Benedict v. City of N. Y., 250 U.S. 321, 39 S.Ct. 476, 63 L.Ed. 1005; Ryason v. Dunten, 164 Ind. 85, 73 N.E. 74; Steifel v. Farmers State Bank, 89 Ind. App. 692, 168 N.E. 30; Ferguson v. Boyd, 169 Ind. 537, 81 N.E. 71, 82 N.E. 1064; Haas v. Holder, 218 Ind. 263, 32 N.E.2d 590; Engel v. Mathley, Ind.App., 48 N.E.2d 463; American Jurisprudence, "Equity", Sec. 508.

■ What has been said about the interest charge applies with equal or greater force to the Foster notes and mortgage loss item. Plaintiff asks that the loss on this loan be charged to defendant on the theory that it should not be permitted to "charge back" this item after it had once been accepted by the defendant as "cash."

The agreement is here again silent as to what and when defendant might include or exclude in the way of securities in the assets side of the so-called liability account. If we were not otherwise inclined to refuse defendant permission to take this security out of the cash transactions and place it in the liability account, we could not so hold in the face of the action of the parties.

The court found that these two notes were selected and taken over by the defendant as equivalent to cash, on March 15, 1930. They were renewed on May 3, 1930, and thereafter, $1,000 was paid on the principal. In September, 1931, the unpaid balance was charged back to the liability account by the defendant. This was with the consent of the then liquidating agent of the plaintiff bank. The directors of the bank knew of this transaction. On November 3, 1937, the indebtedness represented by the notes was compromised by the receiver, and the money received was credited by the defendant to the liability account. Moreover the evidence establishes the fact that in the renewal agreement of the parties this item was included in the liability account. When the notes were charged back to the plaintiff in its liability account, defendant had the consent of the liquidating agent representing the plaintiff bank and this transaction was with the knowledge of the directors of the plaintiff.

In the extension agreement the plaintiff agreed that it was still liable to defendant in the sum of $62,179.61 and it agreed that the defendant held assets pledged by it in the sum of $107,576.89 exclusive of shareholders' liability. This item of $107,576.89 included the Foster notes and the recognized obligation of $62,179.61 excluded any credit for the Foster notes.

In other words, for ten years plaintiff never raised any question as to the propriety of a transaction which its authorized representative agreed to and never questioned the recitals of its extension agreement for nine years. In the settlements made between the receiver and the defendant bank the transfer of the Foster notes to the liability account was accepted as proper.

Our conclusion therefore is that this transaction was not assailable in 1941 when for the first time plaintiff challenged defendant's action in respect to the Foster loan.

The decree is reversed with directions to dismiss the suit.